Wanamaker, J.,
dissenting. I dissent from the judgment in this case for the following reasons:
1. It violates the plain provisions of our State Constitution, as amended in 1912.
2. It is contrary to the paramount spirit and purpose of those amendments.
3. It violates the Workmen’s Compensation Act authorized by those amendments.
4. It violates several sections of the Industrial Commission Act authorized by said amendments.
5. It is contrary to the elementary and well-established principles of judicial construction.
6. It not only deprives Schorling, but thousands of working men and working women, and their dependents, of the right of action safeguarded to them by our constitution and laws.
*333 7. Because I still indulge the hope that this pioneer case for this state upon the subjects of “any lawful requirement” and “safe place to work” shall not become in the future the settled law of Ohio, for the reason that this judgment is a big step backward from the humane conservancy policies of this state, as inaugurated in 1912.
Schorling was employed by thé defendant company at a ripsaw. While so employed he was ordered by the company’s foreman to leave his place of employment at the ripsaw (with which he was familiar) and go to another part of said factory to assist other employes in pushing a load of lumber, which was upon a small car in said factory (with which duty he was wholly unfamiliar).
While acting under the directions of the foreman “said car of lumber was thrown or fell over upon plaintiff, burying plaintiff beneath said lumber.”
Schorling pleaded in his petition that the company “well knew” that the place of employment about said lumber was unsafe, the lumber being carelessly piled on the car by the company, and that, therefore, the company was liable for the careless, negligent and unsafe situation into which they had ordered and directed Schorling to labor.
The case was tried to a jury in the court of common pleas, which returned a verdict for $2,000 for Schorling. A motion for a new trial was overruled and judgment entered on the verdict by the court of common pleas. Error was prosecuted to the court of appeals. That court unanimously affirmed the judgment below. This court now reverses the judgment of both lower courts in favor *334 of Schorling and enters final judgment for the defendant company.
This case was filed in this court in February, 1916. It was argued before this court and submitted May 17, 1916. The court ordered a reargument January 24, 1917, and has just now decided this case. A full year has elapsed since the submission of this case to this court. One of two theories is at once suggested, either unusual delay on the part of the court, or unusual difficulty in arriving at a judgment. There are few who would suggest the former reason, and the latter would more than justify a dissenting opinion upholding both judgments below.
I shall now examine and weigh the premises and principles by which the majority in the syllabus and opinion reverse both judgments below.
The first paragraph of the syllabus uses this language, as the first premise for -the conclusion reached in this case:
“In the construction of amendments to the constitution or to statutes, the body enacting the amendment will be presumed to have had in mind existing constitutional or statutory provisions and their judicial construction touching the subject dealt with.”
I admit the soundness of this legal principle. I deny that it serves to support this judgment, but quite the contrary.
The syllabus avers that the constitution-makers “had in mind
(a) “existing constitutional”
(&) “or statutory provisions”
*335 (c) “and their judicial construction touching the subject dealt with.”
The syllabus does not squarely state whether or not these things the constitutional convention “had in mind” were iox the purpose of continuing them, or for the purpose of changing them. But it is strongly suggested that it was for the purpose of adopting at least the “judicial construction.”
It is a most novel suggestion, to say the least, to assert that constitutional changes presume a desire to continue an existing legal status. It is the general notion that the moving reason for constitutional amendment is to vitally and substantially change the existing legal status.
This proposition of the syllabus presumes that prior to the time of the adoption of these amendments in 1912 there had been a “judicial construction” as to the vital and pertinent parts of them touching the questions involved in this case, to-wit, the language “any lawful requirement” and its application in actions for negligence. This I emphatically deny.
The only case cited in support of this contention is The State, ex rel. Yaple, v. Creamer, Treas., 85 Ohio St., 349.
Now, if that case construes the material language involved here, then I admit that there had been such “judicial construction” and the constitution-makers “had in mind” that construction for some purpose or other.
I call for the reading of the syllabus of that case. It discloses the fact that the only question passed upon in that case was the constitutionality of the *336 Workmen’s Compensation Act of 1911 as a whole, upon the various challenged grounds. The entire syllabus of that case reads:
“The act entitled ‘An act to create a state insurance fund for the benefit of injured, and the dependents of killed employes,’ etc., 102 O. L., 524, is a valid exercise' of legislative power not repugnant to the federal or state constitutions, or to any limitation contained in either.”
Certainly nothing here even attempts to construe the language in question.
The various grounds upon which it was claimed the oíd act in question was unconstitutional did not include either generally or specifically the language involved in the case at bar, and upon that question I call for a reading of the opinion as well as an examination of the briefs.
It is hard to prove a negative, or the absence of something. But the only language in the opinion even remotely relating to the provision of the Constitution of 1912, and Sections 15 and 16 of the Industrial Commission Act, consists of these words:
“Therefore the only right of action which this statute removes from the employe is the right to sue for mere negligence (which is not wilful or statutory) of his employer, and it is within common knowledge that this has become in actual practice a most unsubstantial thing.”
This language is somewhat hazy. It is, to say the least, unfortunate in the use of the phrase “mere negligence.” One might as well speak of “mere burglary” or “mere murder.” If the negligence of the employer proximately causes injury *337 or death to the employe, it would be difficult to seriously characterize such negligence as “mere negligence.”
But even this language recognizes the fact that the employe, under the old act of 1911, did not lose his “right of action” where the negligence was wilful or statutory, and the opinion does not undertake to say that statutory negligence must be specific negligence, for clearly the statute may be either in general or in particular terms.
A careful reading and analysis of the case, the opinion, the briefs and all, demonstrates beyond the peradventure of a doubt that there was no construction of any language pertinent to this case.
We could hardly expect a conclusion to be any more sound or convincing than the premise upon which it is founded.
But there were certain things and particular “judicial constructions” touching the relation of employer and employe and the rights of the employe in actions of negligence, which the constitutional convention undoubtedly "had in mind," not for the purpose of adopting them but clearly for the purpose of avoiding them.
1. The appalling number of industrial accidents resulting in the death of thousands, and the disability, partial or complete, of a still larger number of workingmen and working women in Ohio.
2. The fact that the large majority of such deaths and injuries were wholly incidental to the natural dangers of the employment, and were not the result of any legal negligence of the employer, *338 and that in such cases the whole loss and burden fell on the employe, who was least able to bear it.
3. That in dealing with the large number of deaths and injuries resulting from negligence of the employer there had grown up a system of technical rules and ancient precedents, 99 per cent, judge-made, and applied under the names of assumed risk, negligence of fellow servant, contributory negligence, etc., with the effect that the employe in many such cases was even denied any relief or compensation whatever for the negligence of his employer.
The old order of dealing with personal injuries and' death in connection with the industrial life of the state had become a byword and shame, for which our courts were largely responsible; and of all the proposals before the constitutional convention none more obviously and unanimously demonstrated the sane and settled purpose of that convention to tear up, root and branches, the old order and substitute therefor a new order than did this, as evidenced by Section 34, overwhelmingly adopted on September 3, 1912. That section reads:
“Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power.”
Here was a grant of power to the general assembly of Ohio exceeding any other grant of power ever conferred by the people of our state.
*339 It was as broad and comprehensive a grant, touching the safety and welfare of employes, as the amendment was known, as the English language could make it.
Conservation, in a nutshell, was to be the cornerstone for the new industrial system in Ohio. Conservation was no longer to be limited to forests and mines, to fish and game and hogs, but was to be extended to human life, health, safety, and the welfare of the employes of Ohio. Section 34 gave the general assembly the authority to enact the laws for the safety and welfare of the employes, and the general assembly in turn, in 1913,’ within three months from the time the constitutional amendment went into effect, imposed duties upon the employer by virtue of Sections 13, 15 and 16 of the Industrial Commission Act.
With this chart and compass for the safety of ■the employes let us now further consider the interpretation that this court has placed upon these .several sections of the,statutes.
Let us now examine the second paragraph of the syllabus.
With the first half of that paragraph I entirely .agree. With the second half of that paragraph I entirely disagree. The first objectionable language appears as follows:
“The purpose and intent of Sections 15 and 16 of the act was to bring all employers within the scope of the jurisdiction and authority of the commission and to impose on them the obligation to comply with the orders and requirements of the commission when duly made.”
*340 Of course it is necessary for this court to find some “purpose and intent” for Sections 15 and 16. They were evidently intended to accomplish something, and the syllabus says “the purpose and intent” was one of jurisdiction and authority conferred upon the commission. •
The full answer to that claim as to the intention of the legislature grows out of the fact that the legislature itself passed a special section of the statute conferring jurisdiction and authority on the commission to enforce the laws of the state of Ohio as to safe places and safe appliances.
Section 21, only five sections removed from Section 16 and a part of the same act, reads:
“The industrial commission of Ohio is vested with the power and jurisdiction on and after the first day of September, 1913, to have such supervision of every employment and place of employment and of every other building and establishment in this state as may be necessary adequately to enforce and administer all laws and all lawful orders requiring such employment and place of employment or building or establishment, to be safe ” etc.
Had the legislature intended by Sections 15 and 16 to merely confer the jurisdiction, I ask why did they specially enact Section 21 ?
No; these sections mean just what they say, and say just what they mean. They are their own interpreters, notwithstanding the judgment of this court.
I have endeavored to examine these sections in the light of their origin. Whence did they come? *341 An examination of this fact discloses that they are natives of Wisconsin.
Section 2394-48, Wisconsin Law:
“Every employer shall furnish employment which shall be safe for the employes therein and shall furnish a place of employment which shall be safe for employes therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employes and frequenters.”
Section 15, Ohio Law:
“Every employer shall furnish employment which shall be safe for the employes therein, and shall furnish a place of employment which shall be safe for the employes therein, and for frequenters thereof, and shall furnish and 'use safety devices and safeguards, and shall adopt and use methods and processes, (follow and obey orders and prescribe hours of labor) reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employes and frequenters.”
Section 2394-49, Wisconsin Law:
“No employer shall require, permit or suffer any employe to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide and use safety devices and safeguards, or fail to adopt and use *342 methods and processes reasonably adequate to render such employment and place of employment safe, and no such employer shall fail or neglect to do every other thing reasonably necessary to protect the life, health, safety or welfare of such employes and frequenters; and no such employer or other person shall hereafter construct or occupy of maintain any place of employment that is not safe.”
Section 16, Ohio Law:
“No employer shall require, permit or suffer any employe to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide and use safety devices and safeguards, (or fail to obey and follow orders) or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and no employer shall fail or neglect to do every other thing reasonably necessary to protect the life, health, safety and welfare of such employes or frequenters; and no such employer or other person shall hereafter construct or occupy or maintain any place of employment that is not safe.”
Section 2394-41, Wisconsin Law:
“The term ‘safe’ and ‘safety’ as applied to an employment or a place of employment shall mean such freedom from danger to the life, health or safety of employes or frequenters as the nature of the employment will reasonably permit
Section 13, Subdivision 11, Ohio Law:
“The terms ‘safe,’ and ‘safety,’ as applied to any employment or a place of employment shall mean *343 such freedom from danger to the life, health, safety or welfare of employes or frequenters as the nature of the employment zvill reasonably permit, * * *.”
The only substantial change in the Ohio statute appears in the words added in parentheses.
We certainly are agreed that remedial provisions of the law must be liberally construed, whether those provisions be in constitution or statute. Under the old common law, no one would question Schorling’s right to sue. How, pray, did he lose that right? If he lost it, it must be by Section 35, Article II of the Constitution, and the statutes enacted pursuant thereto. Section 35, so far as pertinent, reads:
“But no right of action shall be taken away from any employe when the injury, disease or death arises from failure of the employer to comply with any lazuful reqziirement for the protection of the lives, health and safety of employes.”
Now apply this liberal rule to this language, and •then read Sections 15 and 16, and Subdivision 11 of Section 13, and tell me how it can be held that these statutes do not contain “any lawful requirement” within the meaning of the constitution.
This court has not only disregarded this liberal rule of construction, but has applied a strict rule of construction. Yes, it has gone farther; it has applied a rule of “weasel construction,” a construction that sucks out of the constitution and the statute the meat, the vitality, the duties imposed, and leaves it merely an empty shell, a mere skeleton of its former self.
I claim that these sections were put into the *344 statute in order to complete and crown the new order of duty and liability; that they were passed pursuant to the grant of power in Section 34.
The old common-law doctrine of the employer’s duty to his employe had long been measured by the language “ordinary care” or “care that an ordinarily prudent employer would take for the safety of his employe.”
The low-water mark of liability for the employer under the old common law appears in The Cincinnati, Hamilton & Dayton Ry. Co. v. Frye, 80 Ohio St., 289. The syllabus of that case reads:
“In an action by an employe against his employer to recover damages for personal injuries, an instruction that the employer owed to his employe the duty to provide him a reasonably safe place in which to work, is erroneous, in that it imposes upon the employer a higher degree of care than the law requires or exacts of him. * * * but the limit of his obligation and duty in- that behalf is to exercise reasonable and ordinary care, having due regard to the hazards of the service, to provide his employe with a safe place in which to perform his work.”
In short, this is just no duty at all. If the employer exercises the ordinary care used by ordinary employers he has -discharged his ordinary duty and the employe gets his ordinary and usual injury, for which there is no liability, ordinarily. Is it any wonder that the workingmen of Ohio were demanding the dawn of a new day for labor, a day when human life was entitled to something more than “ordinary care?”
*345 Probably no case decided by the supreme court of Ohio within the present generation aroused among the people and the legal profession, as well as among the working class, as much indignation and protest as did this Frye case, not only for its technical hair-splitting, but for its positive lowering of the duty that the employer owed to the employe for the employe’s safety. The decision bears date April 27, 1909.
This decision, and others of a kindred kind, no doubt were “had in mind” by the constitutional convention when they proposed and adopted Section 34 as to safety. This decision, and others of a kindred kind, were “had in mind” by the general assembly of Ohio when they passed the Industrial Commission Act and particularly Sections 15 and 16 and Subdivision 11 of Section 13.
They said in effect that “ordinary care” for the safety of employes was not enough, but that “safe” and “safety” shall mean “such freedom from danger to the life, health, safety or welfare of employes * * * as the nature of the employment will reasonably permit.”
How natural it was for the legislature, under the new order or statute of 1913, to declare and define the new relation between employer and employe, the new rights, the new duties, under the new industrial system, by virtue of Sections 13, 15 and 16, and then by Section 21 confer jurisdiction upon the industrial commission to enforce that relation, those rights, those duties; but not of course to suspend or amend them.
*346 If the construction claimed by the court were sound, would it not have been natural and probable for the legislature to have written into Sections 15 and 16 some such language as “when ordered by the industrial commission” or “subject to any order of the commission.”
Undue importance seems to be attached to the words “follow and obey orders.” I always understood the elementary rules of syntax and interpretation to be that when you add negative words to a statute you subtract from the statute, but when you add positive words you add to and broaden the statute. Yet in some way or other it is claimed here that by'the addition of the words “follow and obey orders” all the remainder of the statute is made subject thereto. A most absurd holding.
Much depends of course upon the point of view. The majority opinion throughout proceeds from the standpoint of the employer, upon the claim that he contributed to the fund and therefore was relieved from his civil liability for negligence by suit at law, and entirely overlooks or ignores the viewpoint of the employe and the employer’s duty to conserve the employe’s life and safety.
Be it remembered that these constitutional amendments, Sections 34 and 35, were initiated largely by labor for the benefit of labor, and they are to be construed with a view of protecting and promoting their humanitarian purposes of safety and welfare of the employe, consistent of course with the language of the amendments and the statutes made pursuant thereto.
*347 I now challenge attention to the last sentence in paragraph 2 of the syllabus:
“The provisions of Sections 15 and 16 are not the lawful requirements referred to by, and within the meaning of, Section 35, Article II of the Constitution.”
Query: When is a lawful requirement not a lawful requirement?
By what species of legal legerdemain is an order of the industrial commission made a lawful requirement within Section 35 of the Constitution, and a statute of the general assembly held not a lawful requirement within said Section 35 ?
It would seem to the ordinary observer that the general assembly’s order as to lawful requirement, by a statute, should be as obligatory upon employers as an order of an industrial commission. It is a new doctrine that the creature is greater than its creator. “Thus saith the constitution” or “thus saith the statute” is of little consequence as compared with “thus saith the court.”
The third paragraph of the syllabus I entirely disagree with. It holds:
“The term ‘lawful requirement’ * * * does not include a general course of conduct, or those general duties and obligations of care and caution which rest upon employers and employes, and all other members of the community, for the protection of life, health and safety.”
Why not? Is it not equally important that the “general course of conduct,” general duties and obligations of care, as expressed in the statutes, relative to the relation of employer and employe, *348 shall be as obligatory upon the employer as when expressed in the terms of the common law, the ordinance, or the order of a commission ?
The term “lawful requirement” did include “a general course of conduct * * * for the protection of life, health and safety” until this court spoke in this case, and every line and letter of the constitutional reservation in Section 35, and of Sections 13, 15 and 16 of the Industrial Commission Act, sustain this view.
This court holds in paragraph 4 of the syllabus, that “an order made by the industrial commission to employers generally * * * with reference to safe employment” is a lawful requirement within the meaning of the constitution and the statutes.
Now, such an order “to employers generally” may include a general course of conduct; the result of which is that an order of the industrial commission may be in general terms, but an order of the general assembly of Ohio in the shape of a statute cannot be in general terms.
By what sort of legal juggling can it be held that an order of the industrial commission in general terms is a lawful requirement within the constitution, but that an order of the general assembly of Ohio in the form of a statute in general terms is not a lawful requirement?
This court- has driven some stakes within the last 60 days that I now desire to vividly call to mind.
There was before it for review the case of The State of Ohio v. Schaeffer, from Lake county, reported ante, 215. Among other questions raised *349 was the validity of the statute, Section 12603, General Code, which made it a crime to operate an automobile “at a speed greater than is reasonable or proper, having regard for width, traffic, use, and the general and usual rules of such road or highway, or so as to endanger the property, life or limb of any person.” That statute was challenged as to its validity, its constitutionality. It was claimed that it was so general in its terms, so broad, sweeping and elastic that it was impossible for the driver of an automobile to know what it meant, to know what was required of him; that the words “reasonable or proper” were too indefinite and uncertain; that the words “so as to endanger the property, life or limb of any person” were likewise too indefinite and uncertain; and that by reason of that indefiniteness and uncertainty the provisions of the statute could neither be observed nor en-< forced. In short, that the statute was a nullity. This court', however, held otherwise; and every judge that concurs in the judgment in the case at bar also concurred in the Schaeffer case.
Now, if the general language of said Section 12603 as to automobilists is sufficient to create a “lawful requirement” as against the automobile driver — sufficient legally to create a criminal liability upon his part, when the strict technical rules of criminal construction are applied — it is hard to understand why the general terms of Sections 15 and 16, under the liberal construction required in statutes of remedial nature, are not legally sufficient to create a “lawful requirement” for civil liability, to which the employer is answerable to his *350 employe. These two holdings are in absolute conflict.
The supreme court of Wisconsin has had before it in a number of cases these identical sections of the statute. The result of the reasoning in those cases should be interesting and illuminating.
One of the earliest and most important cases considering; interpreting and applying these statutes is that of Besnys v. Herman Zohrlaut Leather Co., 157 Wis., 203. The first and fifth paragraphs of the syllabus are as follows:
“1. The duty imposed upon an employer by sec. 1636j and secs. 2394-41 to 2394-71, Stats. 1911, is that the place and the method of carrying on the business in which he is engaged shall be as safe as the nature thereof will reasonably permit as regards safety devices and safeguards, reasonably adequate methods and processes, and any other thing reasonably necessary to protect the life, health, safety, and welfare of the employee, and not to require, permit, or suffer an employee to go or be in any employment or place of employment which is not as safe as the nature of the employment will reasonably permit.
“5. The legislative purpose expressed in secs. 2394-48, 2394-49, Stats. 1911, was to impose upon the employer a liability for all injuries resulting from the hazards, risks, and dangers incident to the methods, processes, and conditions of the business furnished, permitted, or suffered by him, however obvious or open such hazards, risks, and dangers might be to the employee.”
*351 This was shortly followed by the case of Sadowski, Admx., v. Thomas Furnace Co., same volume, page 443:
The syllabus so far as pertinent reads:
“1. Secs. 2394-48, 2394-49, Stats., are a part of a new system relative to industrial accidents, by which it was intended to substitute, in lieu of the ordinary rule requiring the master to come up to the standard of reasonable safety as to working place and conditions, the absolute duty to make the employment and place of employment as safe as the nature of the employment will reasonably permit.
“2. The ordinary rule as to construing legislation in derogation of the common law strictly against a purpose to change it, is not to be applied to efforts to create a new system for dealing with personal injuries to employees, but, the legislative purpose being clear to approach the ideal of affording compensation for loss in substantially all cases of accidental injury to employees in the course of their employment, the language of the statute, where open to construction, should be read liberally in favor of that purpose.”
The learned judge rendering the opinion soundly reasons as follows (page 447) :
“Counsel for appellant contend that the trial court dealt with the cause upon a wrong theory; that the legislative requirements aforesaid, standing alone, do not add to the common-law standard of care, and that they have little or no vitality until the industrial commission acts under its supervisory authority and prescribes what shall and what *352 shall not be done to satisfy them; but it seems to follow from what has preceded that they are wrong. The legislature, quite clearly, intended to substitute for the ordinary rule requiring the master to come up to the standard of reasonable safety as. to working place and working conditions, — often tested by the customary practice under the same or similar circumstances, and efficiency as to all dangers reasonably to be apprehended from the viewpoint of ordinary care, — the absolute duty to make the employment and place of employment of employes, not reasonably safe merely, but as safe as the nature of the employment will reasonably permit. In the plainest of mandatory language that was done by sec. 2394-41, sub. 11, defining the words ‘safe’ and ‘safety’ in connection with sec. 2394-48, followed in like mandatory language by sec. 2394-49, creating the duty of the master to not permit an employee to submit himself to any of the dangers designed to be guarded against; and in like mandatory language creating the duty of the employer to ‘provide and use safety devices and safeguards’ and not to fail to ‘adopt and use methods and processes reasonably adequate to render the employment and place of employment’ ‘as safe as the nature’ thereof ‘will reasonably permit,’ and not ‘to fail or neglect to do every other thing reasonably necessary to protect life, health, safety or welfare of employees’ and not to ‘occupy or maintain any place of employment’ that is ‘not as safe as the nature of the employment will reasonably permit.’
*353 “There is little use in enlarging on the plain words of the statute. They must be taken as meaning just what they express, no attempt being made to minimize in favor of employers because of the heavy burdens, seemingly, by the literal sense of words, cast on them. The language in such sense, is not ambiguous under the circumstances characterizing its use. From the viewpoint of modern conditions, modern needs, and modern conceptions of moral obligations to those engaged as employees in supplying the necessary and legitimate requirements of mankind, and that subjects produced to that end necessarily embody the personal injury losses incident thereto, so that the hand of the employer, in repairing such a loss, is but a link in a chain reaching from the field of production in which it accrued to and terminating with that of consumption, — all cast of unreasonable burden upon employers vanishes and there arises that of legislative recognition of serious faults in the old system, endeavor, as fully as practicable, to remedy them, and intent that efforts in that regard shall be taken as broadly as the language used to express them will reasonably permit and is appropriate to carry out the beneficent purpose. The court has spoken several times before on this subject and endeavored to make it plain that the common rule as to construing legislation in derogation of the common law strictly against a purpose to change it has little or no application to the efforts to create a new system for dealing with personal injuries to employees.. History *354 leaves no fair room for doubt as to the purpose being to approach the ideal of affording compensation for loss in substantially all cases of accidental injury to employees in the course of their employment. Therefore the legislative language, where open to construction, should be read liberally in favor of that purpose.”
It is contended that the fact, “that none of the many statutes which specifically define safety appliances and require their use were repealed when the Industrial Commission Act was passed,” supports the judgment in this case.
This I emphatically deny, for the reason that they are in perfect harmony with the general conservation policy. The same may be said of the criminal statutes that have been left in force. They are also entirely consistent with the conservation policy. All these statutes were put upon the statute books and left upon the statute books to prevent negligence, not to punish it.
The same is the underlying policy of all criminal statutes, whether they relate to the industrial or other fields.
It has been further urged that the legislature, by the enactment of certain laws, put an interpretation upon the language in the constitution. Now, the legislature can define its own language, has a right to be its own interpreter, but certainly it cannot define the language of the constitution in any way to bind this court.
It is further urged “that the convention adopted a phrase which should comprehend the enumerated elements of lawful requirements found in that law, *355 the phrase being substantially the one used by the court.”
Now, it is quite clear that no enumeration has been made “of the elements of lawful requirements.” The only enumeration made is an enumeration of agencies by which such lawful requirement may be imposed, to-wit, by ordinance, by order of the commission, by statute. But the particularity required as to either has been nowhere and nowise defined.
There are many other errors of fact, law and logic that have been urged in support of this judgment, but the reasonable limits of this dissent forbid comment upon any of them.
If the compensation law was the paramount purpose of Sections 34 and 35 of the Constitution and the statutes enacted pursuant to them, and conservation only an incident, then this judgment is clearly right. If, upon the other hand, conservation was the paramount purpose of Sections 34 and 35 and the statutes enacted pursuant to them, and compensation only an incident, then this judgment is clearly wrong.
Clearly the constitution-makers realized that full conservation of human life was vastly more important than partial compensation; for compensation could only be partial under any statute. Human life cannot'be measured in dollars and cents, and no one would deny that $3744, the maximum allowed by statute, is but the smallest fraction of compensation for the less- of human life, especially when it occurs by reason of the negligence of the employer in failing to provide a safe place *356 and safe appliances for the protection of his employe.
The march of inevitable and irresistible events since 1912 has been toward conservation of all resources, but human life and limb and health are to be safeguarded above all other resources.
The constitution and statutes of Ohio to-day say to the employer, “you observe the laws of the state to the measure of duty required, to-wit, make your place as safe ‘as the nature of the employment will reasonably permit,’ and you have discharged your full duty. You are not liable in any suit at law for negligence, and the employe if injured partially or fatally must resort to the compensation fund. But if you do not take that measure of care for the safety of the employe, then it is his option to take under the compensation law or to begin an action at law.”
“Safety First” is the slogan of the day. And if that rule of duty shall be observed, industrial accidents will be greatly reduced, the compensation fund will be less drawn upon, and the humanitarian policies of the law will be best administered.
At the time this dissenting opinion was read to the court, it was announced that certain New York cases would be added to the majority opinion. That having been done, I desire to examine them briefly.
The cases are as follows: In the Matter of Jensen v. Southern Pacific Co., 215 N. Y., 514, and New York Central Railroad Co. v. White, 243 U. S., 188, the latter being in the supreme court of the United States, and both cases involving the con *357 stitutionality of the workmen’s compensation law of New York state.
A case is helpful to us in reaching a sound and equitable conclusion exactly in proportion as it involves the same questions as are involved in the case under consideration, and to the degree that the judgment of the court in the cited case is sensible and sound in the course of reasoning pursued.
The sole question in the cases above quoted was the constitutionality of the workmen’s compensation law. There is no such question in the case at bar. The New York cases do not involve in any way a similar constitutional provision to the one involved in the present Ohio case. Neither do they involve any such statutes as Sections 15 and 16, supra.
The error of judgment in this court proceeds from the confusion between a conservation policy and a compensation statute. Section 34, supra, of the Ohio Constitution, places conservation first; then follows Section 35 with compensation, and in that Section 35 there is this particular reservation of rights of action:
“But no right of action shall be taken away from any employe when the injury, disease or death arises from failure of the employer to comply with any lawful requirement for the protection-of the lives, health and safety of employes.”
As before stated, the chief allegation in the petition in this case was that the employer had not provided the employe a safe place to work.
Section 13, Subdivision 11, of the Industrial Commission Act provides that “The terms 'safe’ *358 and 'safety/ as applied to any employment or a place of employment shall mean such freedom from danger to the life, health, safety or welfare of employes or frequenters as the nature of the employment will reasonably permit,” etc.
If this is not a “lawful requirement,” what in the name of common sense is it; especially considered in connection with Sections 15 and 16?
This court holds in effect that it does not become a “lawful requirement” until the industrial commission issues some order in respect thereto. Such never was the intention of the statute. The majority view makes the action of the industrial commission as to lawful requirements superior to a statute of the general assembly of Ohio.
Now, these questions were not involved in the New York cases and cannot by any stretch of the imagination be forced into those cases.
When the employer does his full duty toward conservation of life and limb for the benefit of the employe, under the constitution and the laws, then he is absolved from any further duty than that required by the compensation law; but when he fails in that duty he is liable to the right of action safeguarded to the employe by the very constitution itself, which no legislature or industrial commission may take from him.
But even if the New York cases cited were directly in point, the constitutional provisions and statutes of Ohio were adopted and enacted as humane progressive measures in keeping with the social and industrial spirit of the age. Wisconsin being the home of this policy, which we adopted *359 from that state, I would prefer to follow the progressive humanitarian court of last resort of Wisconsin rather than the conservative court of New York.